**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

---

|  |  |  |
|---|---|---|
| ASSOCIATION OF FLIGHT ATTENDANTS-CWA, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. ____ |
| UNITED AIRLINES, INC., | ) ) ) | |
| Defendant. | ) ) | |

**COMPLAINT**

1. This is an action under the Railway Labor Act to vacate an arbitration award rendered by a United Airlines, Inc. / Association of Flight Attendants ("AFA") System Board of Adjustment on January 29, 2019. This action is necessary because the System Board failed to confine itself to matters within its jurisdiction by departing from the clear and unambiguous provisions of the Agreement. The Board refused to consider a dispute which had been properly submitted to it, and adopted a limitations period which is not in the collective bargaining agreement. As a consequence, AFA-represented Flight Attendants have been wrongfully deprived of millions of dollars in profit sharing payments which United has kept for itself.

**PARTIES**

2. Plaintiff the Association of Flight Attendants-CWA, AFL-CIO ("AFA"), is a labor organization which represents nearly 50,000 flight attendants at twenty different

air carriers throughout the United States. AFA has been certified by the National

Mediation Board as the exclusive collective bargaining representative of the Flight

Attendants employed by United Airlines, Inc.

3. Defendant United Airlines, Inc. ("United" or "the Company") is a carrier by

air subject to the provisions of the Railway Labor Act, 45 U.S.C. § 151, *et seq*. United

Airlines is based in and does business in this judicial district.

## JURISDICTION

4. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 and 45

U.S.C. § 153, First (q) and § 184.

## STATUTORY BACKGROUND

5. Labor relations in the airline industry are governed by the Railway Labor

Act, 45 U.S.C. §§ 151-188 ("the Act").

6. The Act requires air carriers and labor organizations representing

employees to make "every reasonable effort to make and maintain agreements regarding

rates of pay, rules, and working conditions, and to settle all disputes … arising out of the

application of such agreements." 45 U.S.C. § 152, First.

7. The Act creates a process for the making and amendment of collective

bargaining agreements and requires the parties to abide by such agreements unless they

are amended through the procedures of the Act. 45 U.S.C. § 152, Seventh and § 156.

8. The Act requires air carriers and the organizations representing their

employees "to establish a board of adjustment of jurisdiction not exceeding the

jurisdiction which may be lawfully exercised by … boards of adjustment[] under the

2

authority of section 153 of this title." 45 U.S.C. § 184. The jurisdiction of such boards

under section 153 are limited exclusively to the interpretation and application of existing

agreements. 45 U.S.C. § 153, First(i) and Second.

9. An arbitration award which violates the Act, or is made in excess of the

Board's authority or jurisdiction, may be vacated by this Court. *See, e.g., Wilson v.*

*Chicago & North Western Transp. Co.*, 728 F.2d 963 (7th Cir. 1989).

## FACTS

10. AFA has represented the Flight Attendants employed by United Airlines

since 1945. At all times relevant to this action, the AFA and United have established a

System Board of Adjustment pursuant to the requirement of the Railway Labor Act.

11. In late 2002, during a period in which AFA and United were parties to a

binding collective bargaining agreement, United approached AFA (as well as all of the

other labor organizations representing United employees) seeking hundreds of millions of

dollars of annual sacrifices in order to save the airline from bankruptcy and allow it to

continue as an ongoing operation. United sought over $400-million in annual

concessions from AFA-represented flight attendants alone. As an inducement, in partial

compensation for such an agreement, United offered a profit-sharing program applicable

to United employees.

12. These discussions did not lead to an agreement, and on December 9, 2002,

United, its parent company UAL Corp., and a number of affiliated entities filed for

Chapter 11 bankruptcy protection. Shortly thereafter, United filed a motion for authority

to reject its collective bargaining agreements, pursuant to Section 1113(c) of the U.S. Bankruptcy Code, 11 U.S.C. § 1113(c).

13.     As required by Section 1113(c), AFA and United engaged in expedited bargaining regarding amendments to the existing contract which United claimed to be necessary for the carrier to successfully reorganize.  During the negotiations, United again proposed a profit-sharing program with the specific purpose of rewarding employees who would make the sacrifices necessary to save the airline, should the company return to profitability.

14.     Eventually, AFA and United entered into a "Restructuring Agreement" in 2003, which would not become amendable until 2009.  This Agreement included a host of financial concessions from flight attendants which totaled more than $1.8-billion over the life of the contract.

15.     The 2003 Restructuring Agreement also provided for Flight Attendant participation in a common profit-sharing plan which by its terms was limited to U.S. payroll employees of United Airlines.  Flight Attendants were entitled to a 12.2% share of distributed profit-sharing payments, a percentage commensurate with the Flight Attendants' overall share of employee concessions in this round of bankruptcy bargaining.

16.     AFA and United then agreed to modify the overall collective bargaining agreement to incorporate the terms of the Restructuring Agreement.

17.     Even with the substantial cuts of the Restructuring Agreement and related concessions by other employee groups, United remained in bankruptcy.  In late 2004,

United sought additional employee concessions. United now sought an additional $725-million in annual savings over five years and termination of employees' federally-protected defined benefit plans. With respect to AFA and other groups with collective bargaining agreements, United filed a second round of Section 1113 motions to reject those agreements.

18.     United sought additional sacrifices of approximately $138-million per year from its Flight Attendants, plus termination of the Flight Attendants' defined benefit pension plan. United made similar demands of other union-represented employees. Of all the UAL Corp. affiliates that were in bankruptcy, these additional concessions only applied to employees of United Airlines.

19.     AFA engaged in good faith negotiations with United over its new demands. At the same time, the union representing United's pilots (the Air Line Pilots Association, or "ALPA"), was engaged in its own negotiations and led discussions with United regarding the terms of a potential revised profit-sharing plan which might be applicable to other employee groups.

20.     As of January 2005, all the represented groups other than AFA had reached agreement on further contract modifications, including termination of their pension plans. Their pension plans were replaced by a defined contribution plan which included profit sharing. After further negotiation and litigation, AFA and United agreed to a modification of its collective bargaining agreement and to a defined contribution plan. This latter plan included a profit-sharing agreement by which the AFA-represented Flight Attendants would participate in the same profit-sharing plan as the ALPA-represented

pilots. Profit sharing under this plan was to include only the direct employees of UAL Corp. and United Airlines. It did not include employees of any other UAL Corp. affiliates.

21.    To conform the pre-existing collective bargaining agreement with these latest modifications, the AFA and United entered into an amended CBA. This agreement adopted the profit-sharing provisions which had been agreed to and, like the rest of the CBA, applied only to the United Airlines Flight Attendants. This agreement was ratified by the AFA-represented Flight Attendants of United in 2006.

22.    An initial distribution under the profit-sharing plan was made in 2007, based on 2006 profits.

23.    After the above-related events, in May 2010, United Airlines entered into a merger agreement with Continental Airlines. For a period prior to true operational merger of their respective flight operations, each airline operated separately as subsidiaries of a renamed holding company (United Continental Holdings, Inc.). During this time, as a matter of law, the unionized work groups at each separate subsidiary (United and Continental) continued to work under their pre-merger collective bargaining agreements.

24.    During the post-merger / pre-integration time period, the parties referred to United Airlines as "subUAL" or "sUAL," and to Continental Airlines as "subCAL" or "sCAL".

25.    Prior to and immediately after the merger, the subCAL Flight Attendants were represented for collective bargaining purposes by a different union than the subUAL

Flight Attendants. The International Association of Machinists and Aerospace Workers ("IAM") represented the Continental (and then subCAL) Flight Attendants.

26.     The subCAL Flight Attendants, through their union the IAM, had negotiated their own profit-sharing plan which was applicable only to the subCAL Flight Attendants.

27.     In 2011, the National Mediation Board determined that subCAL and subUAL had become a "single transportation system" for Flight Attendant representational purposes and ordered an election between the IAM and AFA. AFA won that election and was certified as the collective bargaining representative of both the subCAL and subUAL Flight Attendants.

28.     Despite the now-unified representation, Flight Attendants at each legacy carrier (United and Continental) remained covered by separate collective bargaining agreements while the AFA and United negotiated a Joint Collective Bargaining Agreement.

29.     Throughout this time, the subUAL profit-sharing plan, as applied to Flight Attendants, expressly provided that it could not be modified unilaterally by the Company.

30.     The Company made a profit-sharing distribution on February 14, 2012, based on 2011 profits. For the first time, it distributed profits from one pool to both subUAL *and* subCAL Flight Attendants, thus decreasing the amount available to the subUAL Flight Attendants. The Company took a similar approach for all employee groups.

31. After the 2012 change to profit-sharing, first the subUAL pilots (represented by ALPA) and then the subUAL Flight Attendants (represented by the AFA) filed contractual grievances based on breaches of their respective CBAs.

32. Both grievances alleged that the unilateral inclusion of the subCAL employees in the profit-sharing pool violated their collective bargaining agreements.

33. The AFA grievance was filed pursuant to the procedures of Sections 26.C and 26.D of its CBA. Under the contractual language and a prior settlement agreement, a 26.C grievance may be filed on a systemwide basis if it involves retrospective pay liability. Company monetary liability for such a grievance is limited to the period 120 days prior to the filing of the grievance.

34. Under Section 26.D, a grievance may be filed over "any alleged misapplication or misinterpretation of this Agreement." There is no contractual time limit for filing a 26.D grievance. But relief under 26.D is prospective only: "The relief sought shall be limited to change of future application or interpretation of the Agreement."

35. The President of the AFA's United Airlines Master Executive Council ("MEC") initiated the contractual dispute resolution process regarding United's interpretation and application of the Profit-Sharing Agreement by filing Grievance MEC 9-12 on June 12, 2012. The grievance relied on both Sections 26.C and 26.D of the Agreement. The grievance was submitted directly to United Airlines Managing Director Labor Relations – Inflight, who denied the grievance on August 2, 2012.

36.     The AFA's International President then submitted the dispute to the United Airlines Flight Attendant System Board of Adjustment ("System Board") on August 30, 2012.  The submission sought retroactive relief concerning the 2011 profit sharing distribution which had already occurred, as well as prospective relief applicable to "subsequent years."

37.     In February 2013, 2014, 2015, and 2016, the Company made additional profit-sharing distributions for profits generated in the previous calendar years. In each case the Company included subCAL Flight Attendants in the distribution.

38.     In January 2015, the ALPA-UAL System Board upheld ALPA's grievance and found that "the Plan here at issue was not intended to include the sub-CO pilots, absent mutual agreement of the parties."

39.     The AFA grievance which had been submitted to the System Board was ultimately heard in 2017.  The System Board was composed of neutral arbitrator Dana Eischen and four party-appointed members.

40.     The System Board issued its decision on January 20, 2019.  The Board held that AFA had filed its grievance more than 120 days beyond the date of the Company's alleged violation and was therefore untimely for purposes of a retrospective remedy regarding the profit-sharing payment for 2011.

41.     With respect to the request for relief for subsequent years, the Board held that "the record … is far from clear concerning the mutually intended consequences" of the 26.D grievance "in this particular case," and that "in the unique facts and circumstances of this case record, the  Board is unable to make an informed

9

determination that mere citation of 26.D time limits is mutually intended to revitalize an untimely filed nonarbitrable claim of contract violation to which the Continuing Violation Doctrine is inapplicable."

42.     Over the dissent of the two AFA members, the Board concluded that the AFA's grievance was "not arbitrable and must be dismissed for violation of the clear and unambiguous contractual time limit filing requirements."

## CAUSES OF ACTION

### COUNT ONE

### THE SYSTEM BOARD ACTED OUTSIDE THE SCOPE OF ITS JURISDICTION BY REFUSING TO CONSIDER A DISPUTE PROPERLY SUBMITTED TO IT

43.     The AFA realleges and incorporates by reference paragraphs 1-42 of the Complaint.

44.     The AFA-United Collective Bargaining Agreement requires that the System Board "shall consider any dispute properly submitted to it … by the President of the Union or by the … Company." § 27.E.

45.     To be properly submitted to the Board, a dispute "shall be addressed to the Chairperson," with a required number of filed and service copies and must contain certain required information. § 27.G.

46.     The Agreement does not give either party the authority to veto the submission of a dispute by the other party, nor does it require mutual consent to the submission of a dispute.

47.     AFA properly submitted Grievance MEC 9-12 to the System Board.

48.     The System Board refused to consider the AFA's grievance for prospective relief on the ground that AFA had not proven that its reference to Section 26.D in Grievance MEC 9-12 was "mutually intended" to mean that prospective relief could be available.

49.     By requiring such proof as a precondition to consider the dispute properly submitted to it, the System Board exceeded its authority, acted outside the scope of its jurisdiction and failed to conform itself to matters within its jurisdiction, in violation of the Railway Labor Act.

COUNT TWO

THE SYSTEM BOARD ACTED OUTSIDE
THE SCOPE OF ITS JURISDICTION
BY ADOPTING A LIMITATIONS PERIOD
WHICH IS NOT IN THE COLLECTIVE BARGAINING AGREEMENT

50.     The AFA realleges and incorporates by reference paragraphs 1-42 of the Complaint.

51.     Section 26.D of the Collective Bargaining Agreement provides for an "appeal" to the  System Board of any dispute over "any alleged misapplication or misinterpretation" of the Agreement provided such appeal "is made in writing by the MEC President or the Union" within thirty days of the Union's receipt of a decision from United's Director Labor Relations-Inflight.

52.     The only time limit under the Agreement for the AFA to submit a grievance under Section 26.D is that an appeal must be made to the System Board within thirty days of the Company's denial of the grievance.

53.     The AFA appealed from the decision of United's Director Labor Relations-Inflight denying Grievance MEC 9-12 within the thirty-day limit.

54.     The AFA's grievance and appeal asserted that the Company was misapplying the Agreement language and sought to change the future application of the Agreement.

55.     The System Board refused to consider the AFA's appeal under Section 26.D on the ground that it was untimely based on the 120-day limit applying only to a Section 26.C grievance.

56.     By applying a limitations period which does not exist in Section 26.D, the System Board exceeded its authority, acted outside the scope of its jurisdiction, and failed to conform itself to matters within its jurisdiction, in violation of the Railway Labor Act.

WHEREFORE, the AFA prays the Court grant the following relief:

A.     Enter judgment in favor of the AFA setting aside that portion of the System Board award which failed and refused to consider the dispute under Section 26.D of the collective bargaining agreement;

B.     Remand this matter to the System Board to revise its findings and conclusions consistent with this Court's order;

C.     Award AFA its attorney's fees and costs in this matter; and

D.     Order such further relief as the Court deems appropriate.

Respectfully submitted,


 s/Patrick E. Deady_____
Patrick E. Deady
Hogan Marren Babbo & Rose, Ltd.
321 N. Clark Street, Suite 1301
Chicago, IL  60654
ped@hmbr.com
(312) 946-1800 main
(312) 946-9818 fax

Jeffrey A. Bartos
Guerrieri Bartos & Roma, PC
1900 M Street, N.W. Suite 700
Washington, DC 20036
202-624-7400
202-624-7420 (Fax)
jbartos@geclaw.com

Attorneys for AFA